## THE COMMERCIAL NATIONAL BANK OF CHICAGO

### v.

### TALMADGE E. SPAIDS, use, etc.

1. BILL OF EXCHANGE—PAID TO WRONG PARTY.—If a bill of exchange be payable to A or A's order, the acceptor or drawee is bound to ascertain that the person presenting it is the one entitled to payment; and if he be deceived and make payment to one not entitled to receive it, the real owner of the bill may recover its amount again from such acceptor, drawee or banker.

2. BILL LOST AT GAMING—INDORSED TO WINNER.—Where the payee of a draft or bill of exchange, having lost the same at gaming, indorsed it over to

.the winner, such contract of indorsement is void under our statute against gaming, and the property in the draft or bill still remains in the payee.

3. INNOCENT HOLDER.—Although. after such indorsement such draft or bill passes into the hands of an innocent holder for value, still the legal consequences, that is, of the indorsement being void, must be the same in the hands of a *bona fide* holder, and no more effect can be given to it than to a forged instrument.

4. FACTS FOR THE JURY.—The question whether the parties contemplated a *bona fide* sale and delivery of grain, or whether the contract was not a mere device to carry out a wager on .the market value of wheat, was properly. left to the jury to decide.

APPEAL from the County Court of Cook county; the Hon. MASON B. LOOMIS, Judge, presiding. Opinion filed May 4, 1881.

This action was special assumpsit by appellee, Spaids, against appellant, the Commercial National Bank of Chicago, to recover the sum payable in and by a bill of exchange drawn on appellant March 10, 1880, by Wells, Fargo & Co., in the State of California, whereby the latter requested appellant to pay at sight to appellee or his order the sum of $350, and delivered the same to appellee. The basis of the action is in substance, that appellee having such bill of exchange, lost the same in a gambling transaction, purporting in form to be divers sales by him in the concern called the Chicago Grain and Provision Exchange, such transaction being conducted between him and one Charles T. Doxey, who was at the time acting as the president and treasurer of said Grain and Provision Exchange, there being no intention on the part of either of the parties to such transaction that any grain should be delivered or received and paid for, but such form was a mere device to cover gambling; said bill of exchange, the watch and chain of appellee and certain sums of money being put up ostensibly as margins, but in fact as mere stakes upon the fluctuation in the market price of such grain, and for no other consideration; that under such gambling and illegal transaction appellee indorsed said bill of exchange in blank, and delivered it to Doxey as and for a part of said margins, and that it was so lost; that thereupon appellee gave notice to the appellant of the fact of his having indorsed said bill to Doxey and lost it in a gambling transaction, and requested the bank not to pay it to Doxey or to any

person other than himself; but the bank, notwithstanding such notice, paid the same to Doxey.

There was a trial before the court and a jury, resulting in a verdict against the bank for the amounts of the said bill, and the court, overruling the defendant's motion for a new trial, gave judgment, and defendant brings the case here by appeal.

The evidence is preserved by bill of exceptions. Error is assigned for overruling defendant's motion for new trial, for giving instructions for plaintiff below, and refusing some asked for defendant.

The evidence for plaintiff below tends to show that he, without having or expecting to have any wheat, went to this Grain and Provision Exchange July 1, 1880, and entered into what is called sale-deals in No. 2 spring wheat for July delivery, at seller's option. Such deals were eight in number. The next day he entered into five more, No. 2 spring wheat for August delivery. The aggregate quantity being twenty-three thousand bushels; that he put up fifteen dollars in money, then fifty, and afterwards his gold watch and chain, which Doxey was to hold as in the place of one hundred dollars, and the said bill of exchange as so-called margins. The evidence tends to show that the manner in which these deals are conducted, is that there is a large blackboard in the room where the customers assemble, on which is noted from time to time the market price of the several commodities, as reported from the Board of Trade, which is near by, from which blackboard the customer takes his price at a particular moment of time; then in racks around the room blanks are furnished, which, for a sale-deal, is in the following form:

"WHEAT.

"To THE CHICAGO GRAIN AND PROVISION EXCHANGE:

"No . . . . . . . .

"I hereby . . . . . . sell you WHEAT (as the order may be given below), and agree that if I do not, without notice, keep good my margin above market price, as per quotations posted from time to time on the blackboard in said Exchange, you may, without notice, sell the wheat for my account, or cancel the contract at any time. If my margin shall at any time be en-

tirely exhausted, the contract shall thenceforth be inoperative and void. I authorize the proper filling of any blanks below which I may neglect, and the correction of any errors in price or time named in this order.

                           " CHICAGO................18..

"According to the above conditions, I.....................

SELL...................... Bushels No. 2 Spring Wheat at

....................per bushel, commissions to be deducted from said price, for delivery in................next.

"Margin, $........

"Time...........

                      "..........................."

The word "time" means when it was taken, according to the last figure on the blackboard.

This ticket is filled out by the customer, and then, with the cash or whatever is put up for the margins, is passed through an aperture in a window in front of a desk in the office, without any colloquium. The margin required is a cent a bushel; the rate of commissions charged is one-eighth of a cent, which comes out of the margins. It also appeared in evidence that it was the ordinary custom of the business for the Grain and Provision Exchange, when a sale-ticket was handed in like the above, to fill out and sign another, in this form:

"WHEAT. Transferable only on the books of the Exchange. All clerical errors subject to correction. Chicago,.., 18... No. ... Subject to the conditions contained in the order bearing even number and date herewith, The Chicago Grain and Provision Exchange buy of .... bushels No. 2 Spring Wheat, for .. delivery (seller's option), at .. per bushel, (which price being commissions. deducted); and said seller agrees that the Contract shall become inoperative and void, without notice, should the margin become entirely exhausted. Time order received ...

Margin, $.. Exhausted at ..

         $..    "       ..

         $..    "       ..        N. C. MURRAY, Sec'y.

         $..    "       ..

         $..    "       ..        Rec'd payment in full."

         $..    "       ..

Spaids testified that no such undertaking as that last above mentioned was delivered or shown to him. The evidence tended to show that by the course of dealing there, the margins put up were exhausted frequently in the course of only a few minutes by the fluctuations of the market, prices going against the customer and as noted on said blackboard, and that in this case although the deals were July 1 and 2, yet on the latter day Doxey made a statement of accounts between himself personally and Spaids growing out of said deals, showing the margins of the latter exhausted, and that he was still behind in the sum of $6.45.

Evidence was given tending to show that Spaids immediately gave notice to appellant's cashier of the facts concerning the loss of said bill of exchange by gambling with Doxey, requesting said cashier not to pay said bill to Doxey or any other person but himself, and that the cashier promised that it should not be paid to any person other than appellee; also that appellee demanded of Doxey said bill of exchange and his watch and chain, but the latter refused to deliver back either; also that appellant after such notice, paid said bill of exchange to Doxey.

Other facts shown on behalf of plaintiff below, appear in the opinion.

On behalf of appellant evidence was given of the charter by the legislature of this State of said Grain and Provision Exchange; also tending to show that an undertaking to buy was entered into by the Exchange with appellee ; also tending to negative appellee's testimony respecting the notice to appellant that the bill of exchange had been lost by gambling, as well as the promise not to pay it to Doxey. But no evidence was offered on behalf of appellant, tending to show that said Grain and Provision Exchange or any of the persons in the management of it, had any warehouse receipts, samples of grain or other commodity, or ever owned, delivered or received a bushel of grain at any time.

Messrs. SLEEPER, WHITON & BROWN, for appellant; that the written contract alone expresses the character of the transac-

tion between the parties, cited Porter v. Viets, 11 Biss. 177; Lyon v. Culbertson, 83 Ill. 33; Pixley v. Boynton, 79 Ill. 351; Gregory v. Wendell, 9 Cent. Law. Jour. 76; Logan v. Musick, 81 Ill. 415; Sanborn v. Benedict, 78 Ill. 309; Walcott v. Heath, 78 Ill. 433; Corbett v. Underwood, 83 Ill. 324; Cole v. Milmine, 88 Ill. 349.

There is no presumption that the transaction was a gambling contract; being made so by statute it must be proved like any other crime: Harbison v. Shook, 42 Ill. 141; Sprague v. Dodge, 48 Ill. 142; Crandall v. Dawson 1 Gilm. 556; Schmidt v. Ins. Co. 1 Gray 529.

The law will not permit appellee to make these contracts, valid on their face, void by merely swearing they were bets upon the market: 1 Greenleaf's Ev. § 383; Walters v. Smith, 21 Ill. 342; Coon v. Nock, 27 Ill. 236; Waddle v. Duncan, 63 Ill. 223; Raplee v. Morgan, 2 Scam. 561; Gobble v. Linder, 76 Ill. 157; Reeves v. Stiff, 91 Ill. 609; Booth v. Hynes, 54 Ill. 363; R. R. Co. v. Herring, 57 Ill. 59; Haycraft v. Davis, 49 Ill. 455; R. R. Co. v. Stumps, 55 Ill. 367; Collins v. Hayte, 50 Ill. 337.

It was not competent to prove by parol that the parties made different contracts than those expressed in writing: Porter v. Viets, 1 Biss. 177; Corbett v. Underwood, 83 Ill. 324; Andrus v. Mann, 92 Ill. 40; Cole v. Milnim, 88 Ill. 349.

Mere notice from the payee to the acceptor of the loss of a bill of exchange, is no defense to the acceptor: Lambeth v. Rivarde, 16 La. 572; Edwards on Bills, 508.

A drawer of a draft before its transfer by the payee, may countermand the order for its payment. It is otherwise where the payee has parted with the title by indorsement: Edwards on Bills, *546; 2 Daniell's Neg. Inst. 238; Story on Bills, § 416.

Mr. CHARLES A. GREGORY, for appellee; that one who indorses a draft to another upon a gambling transaction, does not lose his property therein, cited Rev. Stat. Ch. 38, §§ 126–137; Chapin v. Dake, 57 Ill. 295; Webster v. Sturges, 7 Bradwell, 560; Williams v. Wall, 60 Mo. 318.

A person taking a draft from the indorsee, with notice that

the indorser obtained it on a gambling contract, takes it subject to the rights of the owner:   Chapin v. Dake, 57 Ill. 295; Williams v. Wall, 60 Mo. 318; Koch v. Branch, 44 Mo. 542.

This was a gambling transaction:   Pickering v. Cease, 79 Ill. 328; Lyon v. Culbertson, 83 Ill. 33; Merchants' Trans. Co. v. Goodrich, 75 Ill. 554; · Barnard v. Backhous, 6 N. W. Rep. 14 ; Gregory v. King, 58 Ill. 169 ; Williams v. Wall, 60 Mo. 318 ; Doxey v. Miller, 2 Bradwell, 30 ; Webster v. Sturges, 7 Bradwell, 560.

Parol evidence is admissible in certain cases, to show that the parties meant to violate law:   Hewitt v. Dement, 57 Ill. 500; Cooper v. Nock, 27 Ill. 301; Tenney v. Foote, 4 Bradwell, 594; 1 Greenleaf's Ev. § 282; Bigelow v. Benedict, 70 N. Y. 202.

McAllister, P. J.   This case has been ably and exhaustively argued, both orally and in print, by the counsel for the respective parties, and, after full consideration of all the objections to the verdict of the jury and rulings of the court below, urged on behalf of appellant, we are satisfied, that the judgment is right and ought not to be disturbed.

The rule of law is indisputable, that if a bill be payable to A or A's order, the acceptor or drawee is bound to ascertain that the person presenting it is the one entitled to receive payment.  · And if he be deceived, and make payment to one not entitled to receive it, the real owner of the bill may recover its amount again from such acceptor, drawee or banker.   2 Parsons on Notes and Bills, 596.

In Chapin et al. v. Dake, 57 Ills. 295, the court held that where the payee of two certain drafts, having lost $1,500 at gaming, indorsed these drafts over to the winner, such contract of indorsement was void under our statute against gaming, and the property in the drafts still remained in the payee, in whose favor they had been drawn ; and that, although after such illegal act of indorsement, the drafts passed into the hands of an innocent holder for value, still the legal consequences, that is, of the indorsement being void, must be the same in the hands of a *bona fide* holder, and no more effect could be given

to it than to a forged indorsement.    Under the first mentioned legal proposition, it follows that if Spaids, the appellee, in whose favor as payee the bill of exchange in question was drawn and made expressly payable, had casually lost such bill, or it had been stolen from his possession, and his name forged on the back of it, the property in the bill would, nevertheless, remain in him ; and if appellant had paid it to a holder under such forged indorsement, Spaids being the real owner, could recover of appellant the amount of the bill notwithstanding such payment.

So, also, under the doctrine of Chapin v. Dake, *supra*, if Spaids had engaged in a gambling transaction in grain with Doxey, and such transactions was gambling within section 130 of the Criminal Code, then if the bill was indorsed by Spaids and delivered to Doxey as and for a stake in such gambling transaction and thereby lost, such indorsement was void under the statute, and of no more effect than a forged indorsement.

Whether this rule should obtain to the same extent as in the case of an actual forgery, as affecting the remedy here for a wrongful payment to Doxey, it is not material to inquire, because the evidence tends to show that appellee gave appellant before such payment due notice of the way in which Doxey acquired such indorsement and possession of the bill, and not to pay it to him.

On the trial the court left it to the jury to find from the evidence whether under the contract of Spaids for the sale of wheat, it was intended by the parties to deliver and receive any wheat, and whether or not the contract was a mere device to carry out a wager on the market value of wheat, or was a *bona fide* sale of actual wheat for future delivery; and directed the jury in substance, that if they found from the evidence that it was not the intention of the parties to such contract to deliver and receive any wheat, and the contract was a mere device to carry out a wager on the market value of the wheat, and was not a *bona fide* sale of actual wheat for future delivery, then it was illegal and void; and that then if the jury believed from the evidence that the draft in question was indorsed and delivered to Doxey on such wager contract, and for no other consid-

Commercial Nat. Bank v. Spaids.

eration, and the defendant had notice of such facts before payment of such draft, but afterwards paid the same to Doxey, the jury should find for the plaintiff.

There was evidence tending to support each of the several hypotheses of the instruction, and we are of opinion it was right, and a proper submission of the whole case to the jury. The law applicable to nearly every aspect of these gambling transactions, is fully discussed, and our views expressed in an opinion this day filed in the case of Beveridge et al. v. Hewitt et al., and it is unnecessary to re-state those views in this case.

We are of opinion also that the evidence of facts and circumstances attending the transaction in question, the custom and practices of the so-called Chicago Grain and Provision Exchange, when considered in connection with the form of the papers used, were sufficient to warrant the jury in finding that the whole concern, with its appointments, customs and practices, was but an ingenious device for carrying on a most pernicious system of gambling under the guise of a business establishment for the purposes of legitimate trade and commerce.   It is true, this so-called Exchange had a charter from the legislature of the State, but that in no respects purports to authorize gambling, nor can it be invoked as a shield to pretended officers and agents of the corporation if they carry on gambling in produce in the so-called Exchange instead of legitimate dealing, or affect the legal consequences of their acts. It is true that the name The Chicago Grain and Provision Exchange, imports an institution for legitimate commerce. So did that of the old Stock Exchange of London, but its members and patrons became so addicted to gambling in stocks, that Parliament had to interfere for its repression, as our legislature did in enacting section 130 of the Criminal Code.   It is likewise true that the place of operations of this so-called Grain and Provision Exchange is eligibly located in the vicinity of the Chicago Board of Trade, and the latter has kindly afforded it some facilities for carrying on its illegal practices by means of a telegraphic connection.

But this latter circumstance will hardly suffice to rebut the

inference that gambling was habitually done in the exchange, if the facts and circumstances in evidence justify that inference, and we think they do, and so the jury have found. We have not space to give to the enumeration of all those facts and circumstances tending to that conclusion. There was a total absence in the exchange of warehouse receipts, samples of commodities, and of all the concomitants of actual commerce. The manner of the transactions was unusual and not such as would be adopted in actual commerce; that is, the use of blanks uniform as to terms and the kind of grain. These are filled up by the customer, and then with the customary rate of margins put through a hole in a window, where somebody receives them without colloquium. The deals are always for future delivery. Then the manner in which the fate of the margins is fixed, by quotations of market prices posted on the black board from time to time, and the celerity with which from their very nature, such deals are closed out. Of great significance in showing the true character of this concern, and its pernicious tendencies, is the advertisement of it by its managers to the public. It is headed: " The Chicago Grain and Provision Exchange, 122 and 124 Clark street, Chicago, Ill. Chas. T. Doxey, President and Treasurer; N. C. Murry, Secretary. Incorporated under the laws of the State of Illinois. Capital, $100,000. Commission Merchants and Brokers in grain, provisions and stocks." It then notifies the public that they buy and sell for customers in small lots, and on margins to suit. Grain in 1,000 bushels and over; pork and lard in 25 packages and over, etc. The lowest margins received on grain 1 cent per bushel, etc. " Customers may margin as much more as they please, and put up additional margin at any time before trade is exhausted. Customers are not liable for more than the margin put up. Profits unlimited. Smaller orders have the same facilities and advantages."

This means gambling and gambling only, upon the face of it; and was obviously designed to draw in those who can raise but small sums to hazard. Then in addition to all these facts and circumstances, the very form of the papers employed in the transactions, is in perfect harmony with the theory of their

being mere gambling transactions, and repels the idea of any intention on the part of any body concerned in them, to actually deliver on the one hand or receive and pay for any actual grain on the other.   Appellee entered into, July 1 & 2, 1880, thirteen sale-deals, eight of which were for July delivery, and five for August delivery, at his option.   For margins he put up sixty-five dollars in money, his gold watch and chain, and the bill of exchange in question for three hundred and fifty dollars, payable to his order and indorsed and delivered it to Doxey.   He filled out and signed on his part the usual blanks, but according to his testimony the Exchange or Doxey entered into no undertaking to buy.   In conformity with the practice, then, appellee stipulated (for thus all the blanks are) that if he did not without notice keep good his margin above the market price, as per quotations posted from time to time on the black-board in said Exchange, then the latter might, without notice, sell the wheat for his account, or cancel the contract at any time and if his margins should at any time be entirely exhausted, the contract should from thence forth be inoperative and void.

Appellee testified that he had no grain, and did n't expect to have any; that what he put up he intended to hazard upon the fluctuation of the market price of wheat.   And if such was not the intention of the Exchange or Doxey, why was the contract required to be in that form?   For, by it, if such fluctuations as appeared by the quotations on the blackboard, were against appellee so that the differences in market price brought appellee's margins one dollar below the standard of what was termed good, the Exchange or Doxey had the absolute right, without notice to appellee, to cancel the contract.

Then, as to the other clause: let us for a moment look at its effect.   Suppose that appellee's margins stood the vicissitudes of the market throughout July 2, the day when the last of his contracts were made, but during the morning of July third, the unstable thing fluctuated against him so that for a moment or an hour his margins were entirely exhausted; but suppose, in the afternoon of the same day, there was a reverse current—the fluctuation was the other way, and by the test at

the close of the day appellee's margins were good again, and the market went further in his favor, so that the deal was against the exchange during the rest of the month, during all which appellee had the option to deliver. Now, what was his position under the contract? Why, by its very terms, the circumstance that on the morning of July 3d the market had gone against him so as for a moment, or an hour, the differences exhausted his margins as a mathematical result, the contract became thereby inoperative and void. So that, although at the close of the same day, a change in the market had rendered his margins good, and from thence during the month, the deal was decidedly against the Exchange, still appellee, if he had desired to do so, could not have put himself in readiness and offered to deliver the grain to the Exchange, and on refusal to receive and pay for it, maintain any action for damages. His stake was lost the moment the differences exhausted his margins, no matter what afterwards was the state of the market. According to the doctrine of the Supreme Court in Lyon & Culbertson, 83 Ills. 33, it was a gambling contract on the face of it. We have spent more time on this case than it deserved; we think the verdict was right, and see no substantial error in giving or refusing instructions. The judgment will therefore be affirmed.

Affirmed.